# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 1, 2013

## STATE OF TENNESSEE v. KEEANNA LUELLAN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 11-03593      Chris Craft, Judge**

---

**No. W2013-00327-CCA-R3-CD  - Filed December 10, 2013**

---

A Shelby County Criminal Court Jury found the appellant, Keeanna Luellan, guilty of forgery over $500 and fraudulent use of a credit card over $500.  The trial court sentenced the appellant as a Range III, persistent offender to six years for each conviction and ordered the sentences to be served consecutively for a total effective sentence of twelve years in the Tennessee Department of Correction.  On appeal, the appellant contends that the trial court erred by admitting evidence of other bad acts or crimes and that the evidence is not sufficient to sustain her convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Stephen Bush (on appeal), Barry W. Kuhn (on appeal), and James Allison (at trial), Memphis, Tennessee, for the appellant, Keeanna Luellan.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Kirby May, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

    At trial, Rosalind Harper, the victim, testified that around 5:10 p.m. on September 30, 2010, she left work, stopped at an Exxon gasoline station to refuel her car, and paid for the gasoline with her Renaissance Bank MasterCard debit card.  Afterward, the victim went to

John Wade Childcare to pick up her eight-year-old son. When she arrived at the daycare, she got out of her car and went inside. She was inside the building for about five or six minutes. Thereafter, she and her son went home.

The victim said that around 6:00 p.m., as she was leaving her driveway to take her son to soccer practice, she realized that her "red Dooney and Burke hobo type purse" was not in the car. She searched the house for forty-five minutes to one hour but was unable to find the purse. She recalled that her purse was in her car after she paid for her gasoline and that she put her debit card in the purse. In addition to the debit card, her purse also contained her billfold, which held her driver's license and credit cards; her checkbook; a couple of gift cards; a camera; and one of her son's video games. At approximately 6:40 or 7:00 p.m., the victim logged on to her online checking account and discovered that three, unauthorized purchases had been made with her missing debit card. The victim called the bank to report that her debit card and checkbook were missing so that the bank could block any additional unauthorized charges.

The victim said that the first unauthorized purchase was from Nicole Beauty and Wigs, which was a beauty supply store on Riverdale. She called the store and told the manager that her stolen debit card had just been used to pay for a transaction in the amount of $668.54. After speaking with the store manager, the victim called the Sam's Club store on Winchester and told the security loss prevention officer that two transactions at the store had been made with a stolen card. The victim also called the Southaven Police Department to report the theft, and an officer came to her house to take her statement.

The victim said that the next morning, October 1, she went to the beauty supply store and asked the manager if she could see security video footage of the purchase that was made with the victim's debit card. As she watched the security video, the victim saw two women, one of whom was holding the victim's red purse. The victim took photographs of the video footage with the camera on her cellular telephone.

The victim said that during the next few days, she monitored her online banking account. Over the course of three days, a total of fourteen unauthorized checks were written; specifically, two of the checks were payable to Schnuck's Market and a Kroger grocery store. After each purchase made with her stolen checks and debit card, she notified the managers of each of the stores that the purchases were unauthorized. The victim asserted that she did not know Sherry Chambers, Erica Reed, or the appellant and that she had not authorized the payments from her checking account on September 30 through October 2.

On cross-examination, the victim said that the security video from the beauty supply store showed two black women in front of the counter and a store clerk behind the counter.

-2-

The victim did not recognize either of the women in front of the counter. One of the women was holding a billfold and appeared to be showing an identification. The other woman was "simply standing there." The red purse one of the women was holding looked exactly like the victim's purse. The victim said that her debit card and checks were used a total of seventeen times.

Memphis Police Officer Stanley Ivey testified that from September to December 2010, the police investigated a series of car burglaries at different daycare facilities throughout Memphis. During the investigation, Erica Reed became a suspect in the burglaries. Officer Ivey took Reed into custody and interviewed her. As a result of the interview, the appellant became another suspect in the crimes. Thereafter, on December 16, 2010, Officer Ivey took the appellant into custody.

Officer Samuel McMinn testified that from September to December 2010, he was involved in investigating a number of thefts from vehicles at daycare facilities in the Memphis area. He stated, "They were stealing the women's purse. The female would pull up to the daycare to drop the children off. The suspect would come up and take the purse out of the vehicle and then immediately start using the debit cards, writing checks." The first suspect in the automobile burglaries was Reed. After her arrest, Reed was interviewed, and she gave a statement which resulted in the appellant becoming a suspect. Using the security video footage from several of the businesses where the debit card and stolen checks were used, Officer McMinn determined that Reed and several other women would "go in together and make the purchases."

Officer McMinn said that around October 5, 2010, he learned that the victim's purse was stolen on September 30 and that within the hour, her debit card was used at a beauty supply store, Sam's Club, and a Kroger grocery store. Officer McMinn examined the photographs the victim took from the security video. He prepared a photographic lineup, and on December 16, 2010, Sergeant Pugh showed the lineup to the clerk who was working at the beauty supply store at the time of the transaction.

On cross-examination, Officer McMinn acknowledged that the appellant was standing next to the woman who was holding the billfold. At that point, the following colloquy occurred:

> [Defense counsel:] Do you see anything in those pictures that show[s] that [the appellant] is fraudulently using somebody else's credit card?
>
> [Officer McMinn:] Other than her being with the other

-3-

female making the purchase, no.

[Defense counsel:] Just being there, that's what you're saying?

[Officer McMinn:] Being with the female, yes, with the unknown female, yes.

On redirect examination, Officer McMinn said that the victim informed him that other purchases had been made with her checks or debit card, namely at Schnuck's and Kroger on October 1 and 2, 2010.

Memphis Police Sergeant Matt Pugh testified that from September to December 2010, he was the "team leader" of an investigation into "a ring of auto burglars that were targeting women dropping their kids off at daycares and they were stealing purses out of the cars while the mothers were taking their children inside. . . . The victim's credit cards and identification would be stolen and used at numerous locations throughout the city and the mid-south area." During the investigation, Reed and the appellant were developed as suspects.

Sergeant Pugh said that on December 16, he and Detective Joey Knight went to the beauty supply store and showed two photographic lineups to the clerk: one lineup included a photograph of Reed, and the other included a photograph of the appellant. The clerk immediately identified the appellant as being one of the persons who used the stolen credit card on the day in question; however, she did not identify anyone from the lineup which included Reed.

Innsook Yang, the owner of Nicole Beauty and Wigs, testified that her business sold hair and health care products. She explained that hair was sold in "bundles," and one person would typically use two bundles. Between 6:00 and 7:00 p.m. on September 30, 2010, two women came into the store, and one of the women bought five or six bundles of "high quality hair," spending a total of $668.54. The women were in the store only a short time. Yang said that the women appeared to be friends and that they were talking about "what they going to do with their hair, what they going to buy for the hair." She remembered them because of the unusual number of bundles they purchased.

Yang said during a credit card transaction, she usually asked the buyer for photographic identification and compared the name on the identification with the name on the credit card. However, she usually did not compare the photograph with the person making the transaction.

Yang said that the day after the transaction, the victim came to the store and reported that her purse and the credit and debit cards inside it had been stolen. Yang showed the victim the security video, and the victim used her cellular telephone to take photographs of the video footage. A few weeks after the incident, Yang looked at two photographic lineups. She was unable to identify anyone from the first lineup. From the second lineup, she identified the appellant. She was not "a hundred percent" certain of her identification, but she chose the photograph that most closely resembled one of the women involved in the transaction. At the time of trial, Yang could not remember exactly what the women looked like. She explained that it had been two years since she last saw the women.

On cross-examination, Yang said that when she asked for identification, the woman using the card showed her the entire wallet, including a driver's license photograph. She acknowledged that she did not look at the woman closely; however, the name on the driver's license matched the name on the debit card. Yang stated that the amount of hair purchased was unusual but "not very unusual." She explained that beauticians bought large amounts of hair.

Memphis Police Sergeant Kyle Davis testified that from September to December 2010, he was aiding in the investigation of the theft of the victim's purse. In the course of his investigation, Sergeant Davis obtained a security video, a stolen check, a receipt, and still photographs related to a transaction at Schnuck's on October 1. He also obtained a security video, a stolen check, and still photographs from a transaction at a Kroger grocery store on October 2. The checks used for both purchases were for the victim's checking account.

Erica Reed[1] testified that she and the appellant went to high school together. In 2010, the appellant taught Reed, who had never had a checking account, how to forge a check. Later, the appellant taught Reed to enter "an automobile [at a daycare facility] to get a check, get the checks out of someone's car." Reed and the appellant would then take the checks and "[w]rite them in stores."

Reed was shown the photographs taken from the beauty supply store's security video. She was unable to identify the woman making the purchase; however, she identified the appellant as the woman accompanying the buyer. Reed also viewed the security videos from Kroger and Schnuck's, and identified the appellant; however, Reed was unable to identify the other woman.

On cross-examination, Reed said that in 2010, she was twenty-nine years old. Reed and the appellant had never been charged as co-defendants. Reed said that when she went

_____

[1]At the time of trial, Reed's full name was "Erica Reed Martin."

in stores and wrote "bad checks," she did not try "to duck and dodge the [security] camera." Reed denied any involvement in the theft and use of the victim's checks or the victim's debit card.

On redirect examination, Reed said that "[p]art of this scheme to breaking into cars and getting checks and cash and checks, that was to get clothes; get items; get groceries; get cash." She reiterated that the appellant got her involved in the scheme.

The jury found the appellant guilty of forgery over $500 and fraudulent use of a credit card over $500, both of which occurred at the beauty supply store. The trial court sentenced the appellant to six years for each conviction and ordered the sentences to be served consecutively. On appeal, the appellant contends that the trial court erred in admitting evidence of prior bad acts or crimes and challenges the sufficiency of the evidence sustaining her convictions.

## II. Analysis

### A. Rule 404(b)

The appellant contends that the trial court erred by allowing the State to adduce evidence that the appellant used the checks stolen from the victim's purse at Kroger and Schnuck's. The appellant argues that the evidence was irrelevant, unfairly prejudicial, and served only to "prove the character of a person in order to show action in conformity with the character trait." In response, the State asserts that the evidence was relevant to show the appellant's intent to commit the offenses, to show her involvement in a larger scheme or plan, and to show her guilty knowledge.

Before Erica Reed was allowed to testify about the other transactions, the trial court held a jury-out hearing. Reed testified that she and the appellant had been friends since they attended school together. After Reed lost her job around late 2009, she asked the appellant "how she was getting money." Reed learned that the appellant "knew how to pass bad checks to get money." From late 2009 through 2010, Reed and the appellant began stealing checks and writing the checks for money and items. Reed asserted that she was with the appellant when the appellant stole checks. She said, "[I]t wasn't a frequent[] thing but where we started where the checks came up stolen from, from my knowledge, was from a daycare center." Sometimes Reed and the appellant would write checks together, and sometimes Reed wrote the checks by herself.

Reed said that she was arrested in December 2010; that she pled guilty to twelve counts, which included the fraudulent use of checks and identity theft; and that she received

a six-and-one-half-year sentence, fourteen months of which she served in confinement before being released on parole. After her arrest, Reed spoke with the police about the role she and the appellant had in the automobile burglaries.

Reed looked at the photographs of the security video footage from the beauty supply store and said that she did not recognize the woman at the cash register; however, she identified the woman standing beside her as the appellant. Reed viewed the security video from Kroger and identified the appellant as one of the women in the video. She thought the other woman, whose last name was similar to Chambers, was a friend of the appellant. Reed viewed the security video from Schnuck's and identified the appellant as one of the women shown in the video.

On cross-examination, Reed said that the appellant was not charged as a co-defendant in any of Reed's cases. When Reed was arrested, she "was told that there was an investigation that ha[d] been going on for over six months and that investigation was on Erica Reed, Erica Martin and [the appellant] for car break ins." According to Reed, the appellant had already given the police information on Reed. The only thing Reed knew about the security video footage was that the appellant was one of the women depicted; Reed was not present when the videos were made.

The State contended that Reed's testimony would "enlighten the [j]ury as to the background of this scheme and what was going on. That's the appropriate use of 404B information and provide them the grandeur, the bigger picture of what was going on, rather than this one transaction, especially when you have [a] criminal responsibility case." The State asserted that the transactions depicted on the security videos revealed that "the same two ladies are using the victim's checks. . . . [I]t's the same ladies in the exact same clothes." The State explained that

> this isn't one where she's just present at one chance, at one time with a buddy and didn't know what's going on. She's at all three of these transactions. It shows her, it shows her guilty knowledge and intent to be involved. When you combine that with Erica Reed's testimony about being brought into this scheme by [the appellant] and having, and what was going [on] during that exact same time period and I believe all, those two other transactions and the testimony from Ms. Reed about the other trans – scheme really gives the 404B, the appropriate 404B admissibility to this material.

Defense counsel argued that the woman who used the checks and the debit card had

-7-

not been identified and that she was "the one who seems to be doing, for lack of a better way, doing the paying of this matter. And the paying we know is an illegal transaction." Defense counsel contended that Reed's testimony simply established that the appellant had "a propensity to write bad checks and involve herself in fraudulent schemes and propensity is the very thing that 404B tries to prevent." Defense counsel also argued that identity was not an issue because the appellant had already been identified as one of the women at the beauty supply store. Defense counsel said, "[I]f you're talking about guilty knowledge, [Reed] doesn't know anything about these things. She doesn't know anything about what happened at Kroger's or Schnuck[']s. She simply knows that this person was there and she can say that this person in the past had a propensity to write bad checks and that I did too and we did it together."

The trial court found that three material issues existed other than conduct conforming with a character trait. First, the court stated that the evidence "tends to establish that the [appellant] engaged in a common scheme or plan in the commission of two or more crimes so related to each other that proof of one tends to establish the other. In this case, the checks stolen from the victim when the credit card was stolen." Second, the court stated that the evidence was relevant to the appellant's "intent for criminal responsibility." Third, the court determined that evidence of the other checks cashed were relevant to show her guilty knowledge. The court found that the proof of the other checks was clear and convincing, "[n]ot just from this witness, Ms. Reed, but from the videos." The court prohibited Reed from testifying "about all the checks they've been cashing together." However, the court stated that Reed could "talk about how [the appellant] taught her how to do checks as part of the scheme here beginning with the theft at the daycare center because we're dealing here with the daycare center."

Tennessee Rule of Evidence 404 provides:

> (b) Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon

request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005); State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). Additionally, evidence of other crimes may be admissible to show identity, motive, intent, guilty knowledge, absence of mistake or accident, or a common scheme or plan. See State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 404.6 (3d ed. 1995)). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character.

The photographs established that the appellant and another woman were present at Kroger and Schnuck's at the time the victim's checks were used at those locations. The checks were stolen from the victim at the same time as her debit card, which was used at the beauty supply store. The appellant was with another woman at the time the stolen debit card was used at the beauty supply store. The trial court found that the evidence of the Kroger and Schnuck's incidents was relevant to show the appellant's involvement in a common scheme or plan, her intent to commit the crimes, and her guilty knowledge. Typically, "'intent' proof actually serves to disprove that the conduct was accidental or inadvertent." Neil P. Cohen et al. Tennessee Law of Evidence § 4.04[10] (LEXIS publishing, 6th ed. 2011). A jury may make an "inference that a person intended a certain result if he or she had previously acted in the same way and achieved the same result. This inference is stronger if the previous acts and results closely resemble those alleged in the instant case." Id. Regarding guilty knowledge, "[i]f a person is involved in several similar events, it can be inferred that the person learned the true state of events some time in the process." Id. at § 4.04[11].

Concerning common scheme or plan evidence, a court must determine whether

> (1) the multiple offenses constitute parts of a common scheme or plan, (2) evidence of [the] offense is relevant to some material issue in the trial of . . . the other offenses, and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

Spicer v. State, 12 S.W.3d 438, 445 (Tenn. 2000) (citations omitted).

The appellant's theory of defense was that even if the appellant was present when another woman used the victim's debit card, the appellant was not necessarily a participant in the crimes. Therefore, as the trial court found, the appellant's criminal intent and her guilty knowledge were highly relevant to the issues at trial. Moreover, the evidence helped to establish that the appellant's presence at the beauty supply store at the time the victim's debit card was used was not merely a coincidence; instead, she was an active participant in an ongoing series of crimes related to the victim. See State v. Denise Dianne Brannigan, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *11-12 (Tenn. Crim. App. at Knoxville, June 13, 2012); State v. David B. Todd, III, No. M2006-00142-CCA-R3-CD, 2007 WL 2042477, at *14-15 (Tenn. Crim. App. at Nashville, July 13, 2007). Accordingly, we conclude that the trial court did not abuse its discretion by allowing the State to admit the evidence of the Kroger and Schnuck's incidents.

## B. Sufficiency of the Evidence

Finally, the appellant challenges the sufficiency of the evidence sustaining her convictions. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate

courts.  See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).  Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence.  See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

On count one, the appellant was charged with

> unlawfully, knowingly, and with the intent to defraud [the victim] of the sum of six hundred sixty-eight dollars and fifty-four cents ($668.54), forge and make the signature of [the victim], without the authorization of [the victim], to a MASTERCARD credit slip uttered to Nicol[e] Beauty Supply, Inc. for merchandise, in violation of T.C.A. 39-14-114, against the peace and dignity of the State of Tennessee.

Tennessee Code Annotated section 39-14-114(a) provides that "[a] person commits an offense who forges a writing with intent to defraud or harm another."  Tennessee Code Annotated section 39-14-114 further provides:

> (b)(1)  "Forge" means to:
>
> (A)  Alter, make, complete, execute or authenticate any writing so that it purports to:
>
> (i)  Be the act of another who did not authorize that act . . . .
>
> (2)  "Writing" includes printing or any other method of recording information, money, coins, tokens, stamps, seals, credit cards, badges, trademarks, and symbols of value, right, privilege or identification.

In count two, the appellant was specifically charged with fraudulently using the victim's debit card to obtain merchandise valued between $500 and $1000 at the beauty supply store without the victim's authorization.  Tennessee Code Annotated section 39-14-118(b)(1) provides that "[a] person commits the crime of fraudulent use of a credit

or debit card who uses, or allows to be used, a credit or debit card or information from that card, for the purpose of obtaining property, credit, services or anything else of value with knowledge that . . . [t]he card is forged or stolen." Tennessee Code Annotated section 39-14-118(c)(1) provides that "[f]raudulent use of a credit or debit card is punishable as theft pursuant to § 39-14-105, depending on the amount of property, credit, goods or services obtained."

The appellant complains that Yang was unable to make an in-court identification of the appellant. Additionally, the appellant contends that the proof at trial did not establish that she was the person who used the victim's debit card or who signed the victim's name to the debit card receipt. However, the State contends that the appellant was convicted under a theory of criminal responsibility. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Tennessee Code Annotated section 39-11-402(2) provides that an appellant is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [the appellant] solicits, directs, aids, or attempts to aid another person to commit the offense." In Tennessee, "criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). A defendant convicted under a criminal responsibility theory "is guilty in the same degree as the principal who committed the crime" and "is considered to be a principal offender." Id. at 171. The appellant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

In the light most favorable to the State, the proof adduced at trial revealed that in September 2010, the police were investigating a series of car burglaries that occurred at different daycare facilities throughout Memphis. On September 30, the victim's purse disappeared while she was at a daycare facility, picking up her son. Shortly thereafter, the victim checked her online banking account and learned that several unauthorized purchases had already been made with her debit card, including a $668.54 purchase of hair at Nicole Beauty and Wigs. The next morning, the victim went to the beauty supply store and took photographs of the security video depicting the transaction involving her stolen debit card. Two women were depicted on the video. The woman making the purchase, who was never identified, was carrying the victim's red purse. Yang, who was the clerk at the store at the time of the purchase, identified the appellant as the person who was with the buyer. Yang said that the two women acted like friends and discussed what they planned to do with the

hair being purchased. On October 1 and 2, the victim's stolen checks were used at several locations, including Kroger and Schnuck's. Police obtained security videos of the transactions. Reed, who had been involved with the appellant in the scheme to burglarize automobiles at daycare facilities and steal purses, credit cards, and checks, identified the appellant as one of the women on the security videos. The appellant had recruited Reed to be part of the check cashing scheme and taught Reed how to forge checks. We conclude that the foregoing proof was sufficient to sustain the appellant's convictions of forgery over $500 and fraudulent use of a credit card over $500 under a theory of criminal responsibility.

### III. Conclusion

In sum, we conclude that the trial court did not err in admitting evidence regarding the Kroger and Schnuck's transactions and that the evidence was sufficient to sustain the appellant's convictions. Accordingly, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-13-